Filed 2/5/15  P. v. Medina CA2/5
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE MEDINA et al.,<br><br>      Defendants and Appellants.</td><td>B249059<br><br>(Los Angeles County<br>Super. Ct. No. VA118471)</td></tr>
</table>

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Enrique Medina.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Michael Anthony Barrios.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant Thomas Arellanes.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jonathan J. Kline and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Enrique Medina, Michael Barrios, and Thomas Arellanes were convicted, following a jury trial, of one count of first degree murder in violation of Penal Code[1] section 187, subdivision (a), and one count of attempted willful, deliberate and premeditated murder in violation of sections 664 and 187, subdivision (a). The jury found true the allegations that all three appellants committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22. The jury found not true the allegation that Medina personally used a firearm in the commission of the offenses. The jury found true the allegations as to Barrios and Arellanes that a principal was armed in the commission of the offenses within the meaning of section 12022.53. The court sentenced Medina to 40 years to life in state prison, consisting of 25 years to life in state prison for the murder conviction, plus 15 years to life for the attempted murder conviction pursuant to section 186.22. The court sentenced Barrios and Arellanes to total terms of 82 years to life in state prison, consisting of 25 years to life for the murder plus 25 years to life for the firearm enhancement to the murder conviction plus 7 years to life for the attempted murder conviction plus 25 years to life for the firearm enhancement to the attempted murder conviction. The court stayed sentence on the gang enhancements for Barrios and Arellanes.

Appellants appeal from the judgment of conviction, claiming numerous errors by the trial court. Each appellant joins in the others' contentions to the extent it accrues to his benefit.

Medina contends there is insufficient evidence to support his conviction for attempted murder, the trial court erred in instructing the jury on the kill zone theory of liability, the prosecutor committed misconduct when arguing the kill zone theory, and the trial court's instructions on aiding and abetting contained multiple errors. Medina also contends the trial court incorrectly calculated his presentence custody credits and the abstract of judgment fails to show that his liability for direct victim restitution is joint and several with Barrios and Arellanes.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

Barrios contends the trial court's conduct was partisan and constituted misconduct, the court gave incorrect and incomplete instructions on second degree murder, and the court imposed restitution and parole revocation fines in unauthorized amounts.

Arellanes contends there is insufficient evidence to support his convictions, the admission of text messages sent by Barrios violated Arellanes's Sixth Amendment rights, the trial court erred in failing to instruct the jury that it could convict him of the lesser included offense of second degree murder, the trial court erred in instructing the jury on the kill zone theory of liability, the prosecutor committed misconduct when arguing the kill zone theory and the cumulative effect of the errors was prejudicial. Arellanes also contends his presentence custody credits should be corrected.

Respondent agrees Medina and Arellanes are entitled to additional presentence custody credits and the abstract of judgment should be corrected to show joint and several liability for victim restitution. We agree as well, and order the credits and liability corrected as set forth in more detail in the disposition. We affirm the judgment of conviction in all other respects.


Facts

On November 1, 2010, Barrios lived with Sabrina Ruelas and their young son in Pomona. Barrios's half brother, Medina, also lived with them. When Ruelas came home from work at 6:00 p.m. that day, Medina and Arellanes were at the house with Barrios. The three men were members of the Brown Assassin gang. The men left together when it began to get dark. Barrios drove a gold or light brown sports utility vehicle ("SUV") during that period of time.

At about 9:00 p.m. that night, Eric Caldera was in the front yard of a home on Dork Street in Pico Rivera with some friends when a brown SUV, later identified as Barrios's SUV, stopped in front of the house. There were four occupants in the SUV. One got out of the front passenger door and approached Caldera. Caldera did not know the man, but described the man as being in his mid-twenties, Hispanic, 5'7" to 5'8" tall, and "husky" or muscularly built, wearing a hoodie or jacket and gloves. The man asked

3

Caldera where he was from and about his "Valero" tattoo. Caldera responded that "Valero" meant "love for the valley." The man said "he had love for the valley" and walked away. As he walked away, the man said, "Fuck Viejo."

Pico Viejo is a gang in Pico Rivera. It was a rival of Brown Assassins.

Caldera initially identified Medina as the man who had approached him on November 1. However, at trial, Caldera identified Barrios as the man who had approached him.

Sometime later that evening, Medina, Barrios, and Arellanes arrived at Daniel Perez's house in Pico Rivera. At around 9:45 p.m., Medina, Barrios, and Perez drove to a 7-Eleven store in Barrios's SUV to buy beer.

Medina entered the 7-Eleven to buy the beer while Barrios and Perez waited in the SUV. While they were waiting, Barrios asked a bald-headed man which gang he was from. After Medina returned to the car with the beer, the three men returned to Perez's house to drink. At some point, Barrios stepped outside to speak to someone on his cell phone.

Medina, Barrios, and Arellanes left Perez's house sometime around 10:30 p.m. Perez saw Medina and Barrios give each other a "high-five[]" as they left the house. About five to ten minutes later, Perez's mother, Tina Perez, heard police sirens and helicopters nearby.

Sometime after 10:00 p.m., Jacque Bustamante and his brother-in-law were walking near the intersection of Rosemead Boulevard and Lindell Street in Pico Rivera when an armed man approached them. He was holding a black semiautomatic weapon near his waist. Bustamante described the man as being 5'8" to 5'10" tall, medium build, and Latino. He was wearing a black beanie, black gloves, shorts and a pull-over hoodie with blue or white lettering on the front and on the sleeves. Bustamante identified Medina as the armed man in an out-of-court photo lineup and at trial.

Medina "hit up" Bustamante, asking him what gang he was from, because Bustamante was wearing Pico Viejo gang colors (a Pittsburgh Steelers black and gold T-shirt). Bustamante replied that he did not "gang bang." Medina patted Bustamante's

4

pockets and said that he was looking for drugs. Medina left after Bustamante said he was not a gang member and did not have drugs, but returned less than a minute later. Medina pointed the gun at Bustamante and accused Bustamante of lying to him. Medina said that Bustamante was a Pico Viejo gang member know as "Popeye." Medina said, "Fuck Viejas" and eventually left the scene. Bustamante heard gunshots five to ten minutes after he encountered Medina. Bustamante said the gunshots "sounded pretty close" by.

On November 1, Denise Elizalde was sitting outside her residence on Zola Avenue in Pico Rivera with some friends. At about 10:30 p.m. that evening, she noticed a gold or pewter SUV, later identified as Barrios's SUV, drive up and down Zola Avenue slowly, passing her house several times. Elizalde testified that the SUV had a sticker at the bottom of the back window. After the SUV drove by Elizalde's house the fourth time, she noticed her neighbors, Ruth Rodriguez and Robert Velasquez, walking south on Zola Avenue past her house. Elizalde went inside her house. Five to ten minutes later, she heard several gunshots.

Rodriguez and Velasquez sat on a wall in front of Rodriguez's house. They were smoking marijuana when Rodriguez heard a gunshot and saw a street light go out. After that, Rodriguez saw a brown or tan-colored SUV stop in front of her and Velasquez. Rodriguez testified that the SUV had a sticker on the back window. Rodriguez also noticed three men inside the car – the driver, front passenger, and rear passenger. The men were wearing black or blue ski masks.

The front passenger pointed a gun out the window and fired several shots. Rodriguez took cover behind the wall on which she was sitting, while Velasquez tried to run away. When the gunfire stopped, the SUV drove off and Velasquez lay motionless in Rodriguez's front yard. Rodriguez believed the shooting occurred close to 11:00 p.m.

Los Angeles Deputy Sheriff Timothy Rashford received a "shots fired" call at approximately 10:50 p.m., and he and his partner arrived at the crime scene within five to ten minutes. Deputy Rashford saw Velasquez lying on his left side with what appeared to be a gunshot wound to the chest. Deputy Rashford did not see any weapon on or around Velasquez. Velasquez died from the gunshot wound to his chest.

5

Sheriff's deputies recovered several .45-caliber bullets and nine expended "Federal" .45-caliber shell casings from the crime scene. The shell casings extended for three to four feet in a southerly direction. Ballistics tests showed that the shell casings and bullets were fired from the same gun, likely a Springfield .45-caliber automatic pistol or a Colt.

According to Ruelas, she woke up at about midnight and saw Barrios asleep in bed next to her. She testified that a couple of hours before that, she heard Barrios and Medina come home.

At about 4:00 a.m. on November 2, 2010, Pomona Police Officer Paul Fernandez saw Barrios's SUV parked in a driveway on Diana Avenue in Pomona. He watched the SUV, saw headlights go on, and followed the SUV to a gas station, where the vehicle stopped. Barrios and two other men were in the SUV.[2] Barrios was arrested. Barrios was placed in the back of a patrol car where he remained for several hours.

Deputy Kirk Halladay swabbed Barrios's hands for gunshot residue ("GSR") at the time of his arrest. Later GSR testing showed that Barrios had particles characteristic of GSR on his hands, indicating that he had handled a weapon, discharged a weapon, was near someone who had fired a weapon, or had touched a source of GSR.

There were also particles consistent with GSR on the front passenger seat and front passenger interior door handle. In addition, fingerprints belonging to Medina were discovered on the front passenger exterior door handle.

Inside Barrios's SUV, Detective Ken Perry found one unfired bullet on the left rear passenger side floorboard. The bullet, a "Federal" .45-caliber, had been cycled through the gun which fired the casings recovered at the murder scene. The bullet had jammed and been ejected from the gun without being fired.

The front passenger area of Barrios's SUV contained the DNA profile of at least three different individuals. Arellanes was a possible contributor to the mixture of DNA with a profile match probability being 1 in 8,097 individuals. Medina, however, was

_____

[2]     The other men were not Arellanes or Medina.

excluded as a contributor to the mixture. As for a DNA mixture obtained from the right rear passenger area inside Barrios's SUV, Arellanes and Medina were both included as possible contributors to the mixture. The DNA profile match probability for Medina was 1 in 24 individuals, and 1 in 149 individuals for Arellanes. As for a DNA mixture obtained from the left rear passenger area inside Barrios's SUV (behind the driver), Arellanes and Medina were both excluded as possible contributors to that mixture.

Sheriff's deputies searched Barrios's and Medina's home the day after the shooting. Inside Barrios's bedroom, deputies found a black ski cap and a blue bandana. Both items contained particles consistent with GSR.

Inside Medina's bedroom, deputies found a box containing various types of bullets, including .45-caliber bullets, pictures of people flashing gang signs with "Brown Authority" written on them, a dark blue jacket, and a black bandana. The jacket and bandana tested positive for GSR particles.

On November 3, 2010, sheriff's deputies arrested Medina in Ontario. The black-hooded sweatshirt that Medina was wearing tested positive for GSR particles.

That same day, deputies arrested Arellanes in El Monte. Arellanes tried to flee from the deputies prior to his arrest.

Data downloaded from the cell phones belonging to Barrios, Medina, and Arellanes showed several communications between the three men on November 2, between 4:36 a.m. and 5:37 a.m. At 7:13 a.m., Barrios sent Arellanes a text message that read, "Go buy [sic] bye. Call Devil."

Cell tower data evidence showed that on November 1, at 10:35 p.m., Barrios's cell phone was using a cell tower that was about one and one-half miles from the crime scene. Similarly, Arellanes's cell phone was using a cell tower that was about two miles from the crime scene at 10:10 p.m. on November 1.

According to Daniel and Tina Perez, several days after the shooting, Barrios went to their house with two Brown Assassins gang members – "Villain" and "Youngster." Barrios told Daniel Perez, "[D]on't talk to the cops," and instructed Tina Perez to "keep [her] mouth shut."

7

Julio Lucas told detectives in an interview that Barrios called him on the night of the shooting and asked about police activities in the area of the shooting. Barrios instructed Lucas to "go in there and check what's going on 'cause I know for sure something happened in there. Go in there and see what's going on. Are the cops there?" Lucas stated, "Basically he wants me to go confirm if someone is dead. That's what it was. That's what it came down to. Because he didn't tell me, oh go see – he told me, check it out, see what's going on in there. And then I told him, well what's up? What you guys do? What's going on? And he was like, well that's why I want you to go check, to see what's going on." A week after the shooting, Barrios told Lucas that "Red" (Daniel Perez) was "snitching," and that Lucas needed to "[f]ucking control him and tell him not to fucking open his mouth."

The Velasquez murder occurred in Pico Viejo territory. In response to a hypothetical question that mirrored the circumstances of the shooting in this case, the gang expert opined the crimes were gang-related, and were committed in association with and benefited the Brown Assassins gang.

At trial, appellants called several witnesses for the defense.

Medina called Deputy Leticia Reynoso, Deputy Stephanie Mandujano, and Nicholas Cazares as witnesses on his behalf. Deputy Reynoso testified that when she interviewed Elizalde, Elizalde stated that she was inside her house at the time of the shooting. Elizalde did not mention that she saw an SUV with a sticker before the shooting.

Deputy Mandujano testified that she interviewed Bustamante on November 1, and he stated that the gunman who approached him wore a white T-shirt and a black beanie, not a black hoodie. Bustamante did not say the gunman walked with a limp. Medina's longtime friend Nicholas Cazares testified that Medina had scoliosis, and he walked with a crooked gait.

Cazares also testified that Medina came to his house in Ontario at around 11:00 p.m. on November 1, and they drank beer and played video games until 3:00 a.m.

8

Cazares specifically recalled that Medina came to his house the night before the police searched the house. However, evidence showed that the search occurred on November 3.

Barrios called Eduardo Garcia, his employer, to testify on his behalf. Garcia confirmed Barrios worked for his construction company. Barrios used a powder-actuated nail gun daily. Garcia stated it was not uncommon for workers to wear ski caps when the weather was cold and bandanas as a dust mask.

Discussion

1. Judicial misconduct

Barrios contends the trial court repeatedly injected its own objections into the trial and made rulings in front of jurors that demonstrated the court's disregard for Barrios's counsel. He contends that the trial court's lack of impartiality constituted misconduct. Barrios did not object to the court's conduct during trial.

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) A defendant's failure to object does not prevent review if an objection would have been futile. (*Ibid*.)

Barrios contends objections would have been futile because the trial court was committed to an "aggressively active" role in the trial. He also points out that the trial court refused numerous requests by his counsel for sidebars. He contends that if the claim is forfeited, he received ineffective assistance of counsel.

We agree with Barrios in part. The court did consistently take an active role in the questioning of witnesses, and did refuse many of counsel's requests for sidebars. An objection to the court's active role in proceedings would no doubt have been futile. Accordingly, we will review Barrios's claim.

a. Applicable law

"'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.' [Citation.]

9

To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. [Citation.] As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.'" (*People v. Sturm, supra,* 37 Cal.4th at p. 1237.)

Concerning examination and cross-examination of witnesses, the trial court has a duty to "exercise reasonable control over the mode of interrogation of a witness so as to make such interrogation as rapid, as distinct and as effective for the ascertainment of truth, as may be . . . ." (Evid. Code, § 765, subd. (a); see *People v. Carlucci* (1979) 23 Cal.3d 249, 255 [the trial court has a duty to ensure ambiguities and conflicts in the record are resolved to the extent possible].) A trial court has broad discretion in controlling the scope of cross-examination. (*People v. Lancaster* (2007) 41 Cal.4th 50, 102.)

"However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.]" (*People v. Sturm, supra,* 37 Cal.4th at p. 1237.) "Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.] A trial court commits misconduct if it '"persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge."' [Citations.]" (*Id.* at pp. 1237-1238.)

b. Elizalde

Barrios contends the trial judge twice improperly curtailed his cross-examination of prosecution witness Elizalde and thereby improperly interfered with his ability to present a defense. We do not agree.

10

Barrios contends the trial court first interfered when defense counsel was attempting to demonstrate on cross-examination that Elizalde was being untruthful about her relationship with the victim and his father. The trial court interrupted counsel as he began to ask Elizalde if she knew that the victim's father was a member of the Pico Viejo gang. The court stopped counsel before he could make the gang reference.

If anything, the court was trying to help defense counsel, not hinder him. Outside the presence of the jury, the court pointed out that counsel and his cocounsel had moved to restrict the amount of gang activity that would come out during trial, but that counsel's question would open the door to more gang evidence. The court stated: "I'm just advising you that you are opening a door. If you want to open it, that is your call." The court added: "I'm not here to stop you from examining. You are misunderstanding." Once the jury returned, defense counsel asked Elizalde; "But you know that his father was involved with Pico Viejo?" The witness replied that she did not.

Defense counsel then began to impeach Elizalde on this topic, using her preliminary hearing testimony. After counsel read a series of eight questions and answers, the trial court stated; "At this time I'm going to sustain my won [*sic*] objection under section 352 , and I'll ask you to terminate now. Your record is made."

There was no improper interference from the court. As the subsequent discussion outside the presence of the jury made clear, the court mistakenly believed that the evidence about Pico Viejo was in the record. When the trial court learned from defense counsel that the Pico Viejo evidence was not yet part of the record, the court permitted defense counsel to proceed. Defense counsel then read the preliminary hearing testimony in which Elizalde testified that she called a relative to get in touch with the victim's family because that person "hangs out or knows people" from the Pico Viejo gang.

c. Ruth Rodriguez

Barrios contends the trial court abandoned its neutral position by reviewing key testimony with Rodriguez before she testified and later improperly curtailed cross-examination of Rodriquez about her marijuana use. We do not agree.

Taken in context, the trial court's brief summary of Rodriguez's expected testimony cannot be reasonably understood as improperly "reviewing" her testimony with her. The court was questioning Rodriquez because she did not want to testify at trial. The court's brief summary of Rodriguez's testimony was part of an effort by the court to convince Rodriguez that she would not be a "snitch" if she testified, because she did not see the shooter and was not naming anyone. The judge told Rodriguez several times that he just wanted her to "say what you saw that night" and "say what happened out there" and "tell us what happened that night." There is nothing improper in that. Further, it seems very unlikely that the witness misunderstood the court as suggesting that she testify in a certain way or was somehow unconsciously influenced to testify in the manner summarized by the court, since she did not testify that the shooter was in a gold SUV. She testified that the shooter was in a little car and she did not remember the color.[3]

The trial court did not improperly curtail counsel's cross-examination of Rodriguez. There was no dispute that Rodriguez had smoked marijuana earlier in the evening. The line of questioning which the court interrupted involved Rodriguez's intent to smoke marijuana again that night. Counsel addressed the issue slowly and obliquely, eventually asking the somewhat argumentative question: "If had you [*sic*] already smoked it, why did you need to smoke it again?" Counsel's reason for inquiring about this planned activity is not clear, and he did not attempt to clarify it for the trial court. If Rodriguez was planning to smoke marijuana again, it would be reasonable to infer that it was because she was not under the influence of the earlier marijuana at the time of the shooting, an inference which would not be favorable to the defense since it would

---

[3]    She was impeached with her preliminary hearing testimony that the vehicle was a light tan SUV.

increase the likelihood that her description of the SUV was accurate.  The trial court did not abuse its discretion in curtailing the cross-examination.

### d.  Reynoso

Barrios contends the trial court improperly curtailed his cross-examination of Deputy Reynoso, a witness called by Medina.  We do not agree.

Deputy Reynoso had interviewed Elizalde shortly after the shooting, and Elizalde did not mention that she had seen an SUV with a sticker before the shooting.  Barrios's counsel asked the deputy:  "[W]hen you go to do a canvass--"  The court interrupted and told counsel that he could not question the deputy about "her standards and procedures."  The court nevertheless permitted Barrios's counsel to ask the deputy about her training in conducting interviews as part of a canvass, and whether she followed those procedures in interviewing Elizalde.  Thus, Barrios has not shown how the trial court's ruling curtailed his cross-examination in any meaningful way.

### e.  Daniel Perez

Barrios contends the trial court improperly curtailed his cross-examination of prosecution witness Daniel Perez.  We do not agree.

Defense counsel asked Perez if he had "an exact memory of these events?"  Perez replied, in part, "I don't remember what time it was or like none of that . . . ."  Defense counsel then asked, "Do you have a memory about the time things happened and the dates that they happened?"  Perez replied, "No."  Counsel then asked if he had "an exact memory about the order that things happened?"  The court asked what things counsel was referring to, and counsel replied, "Any events that he has testified to."  The court then sustained its own objection that the question was vague and ambiguous.  The court asked, "Are you talking about from the beginning of the his testimony to the then end?"  Counsel replied that he was talking about "a one- to three-day period."  The court then sustained its own objection that the question was overbroad.

13

The trial court's objections were accurate. The trial court has a duty to "exercise reasonable control over the mode of interrogation of a witness so as to make such interrogation as rapid, as distinct and as effective for the ascertainment of truth, as may be . . . ." (Evid. Code, § 765, subd. (a); see *People v. Carlucci, supra,* 23 Cal.3d at p. 255 [the trial court has a duty to ensure ambiguities and conflicts in the record are resolved to the extent possible].)

Perez readily admitted that he did not have a good memory of the dates and times of events. The dates and times of the key events in Perez's testimony were shown through other evidence. The 7-11 incident was captured by a security video with a date and time stamp. The time appellants left Perez's house was shown by the testimony of Perez's mother. Nothing in the court's objections precluded defense counsel from asking more specific questions, such as did event X happen before or after event Y. Barrios has not shown that the court's objections curtailed his cross-examination in any meaningful way.

f. Lucas

Barrios contends the trial court improperly curtailed cross-examination of Julio Lucas, called by the prosecutor but hostile to both sides. We do not agree.

During the early part of the prosecutor's examination of Lucas, defense counsel requested a sidebar and stated that the witness was clearly lying. The prosecutor agreed. The court agreed that the parties could impeach Lucas. The prosecutor sought and received permission to play a taped interview of Lucas to impeach him. Barrios contends that "equal-handed treatment" required that he be permitted to impeach Lucas with his prior convictions for unlawfully possessing a handgun and selling drugs. Barrios never expressly sought permission for such impeachment.

Counsel did ask Lucas about his prior conviction for possessing a handgun. Lucas acknowledged the conviction. If counsel wished to next impeach Lucas with a prior conviction for selling drugs, he could have asked him about such a conviction. He did not. Instead, counsel asked Lucas about drug sales, which Lucas denied. After Lucas's

14

second denial, the trial court said, "Counsel, under 352, I will ask you to move on." The court acted properly in terminating a line of repetitive questioning which was time consuming and unproductive.

The taped interview played by the prosecution demonstrated that Lucas was not truthful. The jury was aware that Lucas had a criminal conviction for possessing a handgun. Lucas was thoroughly impeached even without evidence of a conviction for drug sales, assuming such a conviction occurred.

g. Tina Perez

Barrios contends the trial court improperly foreclosed him from impeaching Tina. We do not agree.

Barrios first contends that the trial court improperly curtailed his attempts to impeach Tina with her prior convictions. Barrios's counsel was able to impeach Tina with a prior conviction for child abuse, and a prior conviction for petty theft.

The court only intervened when counsel attempted to question Tina about two convictions for violating section 148, but counsel's question showed that he was unfamiliar with the nature of the conviction. He asked, "you have two convictions of California P.C. 148. Is that resisting arrest or giving false information to a police officer?" The court found this was improper impeachment.

Resisting arrest is a violation of section 148, but whether it is a crime of moral turpitude would depend on the underlying facts of Tina's offense. Counsel's question indicates he was not aware of those facts. Giving false information to a police officer would be a crime of moral turpitude, but not a violation of section 148. (See §§148.3, [false report of emergency]; 148.5 [false report of criminal offense]; 148.9 [giving false identification to police].) Counsel made no attempt to explain how the underlying facts of the offense(s) qualified as crimes of moral turpitude, and given his question it seems unlikely he could have done so.

Barrios next contends the court improperly curtailed his attempts to impeach Tina with prior inconsistent statements and testimony. Here, too, Barrios's counsel was able

to impeach Tina with prior testimony. The court only intervened when counsel's questions became confusing and possibly repetitive and counsel was unable to articulate the relevancy of the questions.

Counsel asked Tina numerous questions about previous statements and testimony. She generally replied that she did not remember. Counsel then asked Tina if she had testified at the preliminary hearing that her son was a gang member. When she denied this, counsel read her testimony from the preliminary hearing transcript, in which she admitted her son was a gang member. Counsel then started to ask another, somewhat convoluted question about Tina's preliminary hearing testimony, and it was at this point the court intervened. Counsel was unable to address the court's concerns about the questions, and the court instructed counsel to move on.

Following a series of questions about children in the neighborhood who were in tagging crews and gangs, the court told counsel to come to a sidebar. The court opined that counsel's questions were "meandering with no focus" and asked what the relevance of the questions were, given that "we know she lives in a gang neighborhood." Counsel did not make a relevancy argument. The court then told counsel, "I just want to make sure you have a record. I'm not trying to cut you off." Counsel replied, "I don't think you are cutting me off. I think you have good points."

h. Paul Fernandez

Barrios contends the trial court improperly curtailed his cross-examination of Officer Paul Fernandez. We do not agree.

Barrios contends the court prevented him from questioning Fernandez about how he held/used his flashlight, whether Fernandez searched Barrios's SUV and who relieved Barrios at the gas station. Barrios contends these questions were relevant to the delay in the discovery of a .45-caliber round in the SUV.

It was undisputed that Fernandez did not search the SUV. Counsel was permitted to ask Fernandez if he ever "even peer[ed]" into the SUV. Fernandez replied that he did not. Fernandez agreed that visibility was not difficult at the gas station and he was

16

carrying a flashlight. The court found the manner in which Fernandez carried a flashlight was not relevant. The court was correct. Barrios established that the gas station was well lit and Fernandez had a flashlight, but did not search the SUV. There is no apparent relevance to how Fernandez carried the flashlight.

Counsel was permitted to ask Fernandez if he was relieved by Sergeant Perry at 8:30 a.m. Fernandez replied that he did not remember. Fernandez did agree that he was relieved after sunrise. Counsel was not permitted to attempt to refresh Fernandez's recollection as to the name of the officer who relieved him. Whether Fernandez remembered Perry's name or not, there was no dispute that Sergeant Perry came to the gas station the next morning and stated that he discovered the round at that time. There is no apparent relevance to the fact that Perry relieved Fernandez.


i. Eric Caldera

Barrios contends the court improperly limited his cross-examination of Caldera concerning Caldera's convictions. We do not agree.

At some point, the prosecutor provided defense counsel with a list of convictions for Eric Caldera. When counsel asked Caldera about the first conviction on the list, for mail fraud, Caldera denied that he had suffered such a conviction. The prosecutor asked for a sidebar, and explained that he did not know if all the convictions on the list were for the witness Eric Caldera. The prosecutor represented that he was certain the witness had been convicted of felony vandalism, burglary and petty theft. The court ruled that defense counsel could ask about the burglary and petty theft convictions, which were "clean," and showed dishonesty, and would make it clear that Caldera was a convicted felon.

It was clear that defense counsel had not verified that the listed convictions were suffered by the witness Caldera. Thus, any questions about other convictions would have been a fishing expedition. The trial court acted reasonably in limiting the questioning to verified convictions, particularly since those convictions showed dishonesty. Even assuming the trial court should have granted counsel a little more leeway, there is nothing

17

in the record to show that the fishing expedition would have been successful and thus nothing to show prejudice.

### j. Wayne Holston

Barrios contends the trial court improperly curtailed his cross-examination of Detective Wayne Holston concerning Caldera's failure to select Barrios from a six-pack photographic line-up. We do not agree.

Barrios identifies three areas where his cross-examination was curtailed: (1) the basics of eyewitness identification; (2) Holston's opinion about Caldera's suggestibility; and (3) whether Holston got the impression that Caldera thought the vehicle he saw was a clunker.

When defense counsel sought to question Holston about the "basics" of eyewitness identification, the court ruled the questioning was beyond the scope of direct and that Holston was not an identification expert. The court was correct. Simply being a police officer does not make one an expert in eyewitness identification.

The court found that Holston's opinion about Caldera's suggestibility would be "speculation." Defense counsel did not lay any foundation to show that Holston had any expertise in evaluating the personalities of witnesses. Holston's personal opinion, if he had one, was not relevant. The court also found that Holston's "impression" that Caldera believed the vehicle he saw was a "clunker" would be speculation. Barrios offers no explanation of how it could be otherwise. Holston had no special ability to read Caldera's mind. Further, whether Caldera thought the vehicle was a clunker or not was simply irrelevant.

### k. GSR expert

Barrios contends the trial court improperly curtailed his cross-examination of GSR expert Katrina Fritz on the topics of cartridge based nail guns and GSR transference. We do not agree.

18

Before Barrios's cross-examination began, Fritz testified that "consistent with GSR" particles containing one or two elements could come from firearms but could also come from many sources other than firearms. One source of "consistent with GSR" particles is cartridge based nail guns. Barrios contends he presented evidence that he and his coworkers used cartridge based nail guns and so the trial court acted improperly in preventing him from asking the GSR expert if she was aware of what he did for a living. He contends that his next question would have been whether the expert's opinion changed in any way knowing that Barrios worked with a nail gun. The court found the question lacked foundation. Technically, the question was attempting to lay a foundation. However, Fritz was a prosecution witness and Barrios had not yet presented his defense evidence. Thus, it appears Barrios would have been unable to lay a foundation.

Counsel was able to ask a hypothetical question on this subject, as follows: "If you are doing construction work and you are around a lot of different chemicals, a lot of different types of metals, could that be consistent with GSR also rubbing against it while working?" Fritz replied: "There are consistent particles that are produced by certain construction materials, such as cartridge based nail guns. [¶] The consistent particles lead and barium are produced in certain nail gun based cartridges. Those are also produced in GSR." Thus, if counsel later introduced evidence that cartridge based nail guns were used at Barrios's job, there would be an explanation for the "consistent" two particle GSR found on Barrios and his belongings.

We note that "characteristic GSR" particles containing three elements were also found on Barrios's hands. This was the more incriminating GSR evidence, since "characteristic GSR" particles only come from guns. Showing that Barrios worked with cartridge based nail guns would not explain the presence of the "characteristic GSR" particles.

19

l.  Opening statement

Barrios contends the trial court acted improperly in calling for a sidebar during counsel's opening statement and then ruling that counsel could not mention the contents of rumors in the community following the shooting.

There was no impropriety.  The court was correct that the contents of the rumors would be hearsay.  Defense counsel did not identify any exception to the hearsay rule. There is nothing to suggest any disrespect by the court to Barrios's counsel.  Moreover, counsel for codefendant Arellanes objected that the contents of the rumors would be prejudicial to his client, so the court was not alone in believing it inappropriate to delve into the contents of the rumors.

2.  Murder instructions

Barrios contends the trial court erred in modifying CALCRIM Nos. 520 and 521 by deleting certain references to second degree murder, and by failing to instruct the jury that second degree murder included an unpremeditated murder with express malice. Arellanes separately contends the trial court erred in failing to fully instruct the jury on second degree murder.  There was no error.

a.  Forfeiture

Respondent contends appellants have forfeited these claims by failing to object to the trial court's instructions or to request clarification or amplification of those instructions.  We do not agree.

The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.)  This duty includes a requirement to instruct on "lesser included offenses is there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not the lesser." (*Id*. at p. 745.)  Appellants' claims are essentially that the trial court failed to fulfill this obligation.

20

b.  CALCRIM Nos. 520 and 521

Barrios is mistaken in his claim that the trial court modified CALCRIM Nos. 520 and 521.

Trial in this matter took place in November 2012.  The trial court used the then current versions of CALCRIM Nos. 520 and 521.  The court did not delete any references to second degree murder.  The versions of CALCRIM Nos. 520 and 521 quoted by Barrios in his brief are the 2013 versions of the instructions.  They did not exist at the time of trial.

We will treat Barrios's claim as a claim that the previous version of CALCRIM Nos. 520 and 521 used by the trial court were not accurate statements of the law because they did not tell the jury that murder is "presumptively" in the second degree and that if the prosecutor fails to prove the murder is in the first degree, it is "by default" the lesser offense of second degree murder.

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.  [Citation.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  We see no such likelihood.

The version of CALCRIM No. 520 used by the trial court was titled, "First or Second Degree Murder with Malice Aforethought" and stated that if a defendant killed another person with malice aforethought, he was guilty of murder.  It then stated that if the jury decided that the defendant committed murder, it "must then decide whether is it murder of the first or second degree."  The version of CALCRIM No. 521 used by the trial court told the jury there were two theories of first degree murder in the case, and "the People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."  It necessarily follows that, if

21

the People proved the defendant was guilty of murder but failed to prove either of the first degree murder theories, the defendant was guilty of second degree murder.[4]

The 2013 versions of CALCRIM Nos. 520 and 521 referenced by Barrios make explicit what was implicit in the earlier versions. The 2103 version of CALCRIM No. 520 ends by telling the jury that if they "decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree . . . ." The 2013 version of CALCRIM No. 521 ends by telling the jury, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree." While these changes are undoubtedly improvements, the changes do not mean that the previous versions were inaccurate or incomplete.

c. Second degree murder

Barrios contends the evidence supported a theory of an unpremeditated murder with express malice, which is second degree murder, and the trial court erred in failing to instruct the jury on express malice second degree murder as a lesser included offense.[5] We do not agree.

---

[4] Arellanes contends that because the instruction used the term "lesser crime" but failed to explicitly tell the jury that second degree murder was the "lesser crime," the jury would have had no means of finding the defendants guilty of second degree murder. That is a not a reasonable reading of the instructions. In context, "lesser crime" clearly refers to second degree murder. Further, even if the instructions were ambiguous on this issue, CALCRIM No. 640, which explained the verdict forms in this case, expressly told the jury that "if all of you agree that the defendant is not guilty of first degree murder but also agree the defendant is guilty of second degree murder, complete and sign the form for . . . guilty of second degree murder."

[5] To the extent Arellanes contends the instructions fail to define implied malice second degree murder, he is mistaken. The jury was instructed on the definition of implied malice and that a killing with implied malice was murder. The jury was further instructed that additional facts such as premeditation and deliberation were required to make the murder in the first degree. These instructions together adequately described the offense of second degree implied malice murder.

It was undisputed that the shots were fired from a motor vehicle. The jury was correctly instructed that if those shots were fired with an intent to kill, the shooter was guilty of first degree murder. (§ 189 ["any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside the vehicle with the intent to inflict death, is murder of the first degree."].) Since there was no evidence that the shots were fired from a location other than a motor vehicle, there was no evidence to support a theory of second degree express malice murder.

Even assuming the jury speculated that the shots were fired from another location, CALCRIM No. 520 told the jury that second degree murder could be committed with express malice. The instruction was titled, "First or Second Degree Murder with Malice Aforethought." The instruction first told the jury that in order to find the defendant guilty of the crime of murder, the jury must find that he acted with malice aforethought. The instruction also explained that there were two kinds of malice: express or implied. The instruction concluded by telling the jury that if it decided that a defendant committed murder, *then* the jury had to decide if the murder was first degree or second degree murder. Thus, the instruction clearly told the jury that second degree murder could be committed with express malice. It is unreasonable to read the instruction otherwise.

Appellants' reliance on *People v. Rogers* (2006) 39 Cal.4th 826 to show error is misplaced. In that case, the trial court gave two general instructions on murder plus a specific instruction on willful, deliberate and premeditated first degree murder and CALJIC No. 8.31, which instructed the jury on second degree implied malice murder. The court did not give CALJIC No. 8.30 on second degree express malice murder. (*Id.* at p. 866.) Thus, the trial court's instructions inadvertently emphasized the implied malice form of second degree murder. The instructions in this case gave no such emphasis to one form of second degree murder. Further, the Supreme Court rejected the defendant's claim that the instructions might have caused the jury to convict him of first degree murder if it found that the killing was intentional but not premeditated because the instructions gave no viable option to convict him of second degree murder for such a killing. The court held that nothing in the instructions "precluded the logical conclusion

23

that if defendant intended to kill, he acted with 'wanton disregard for life' or knew that 'his conduct endangered the life of another' and acted 'with conscious disregard for human life.' Thus, the instructions, reasonably understood, did not preclude a finding of second degree murder if the jury believed the killing was intentional." (*People v. Rogers, supra*, 39 Cal.4th at pp. 868-869.) The same is true here.

### 3. Attempted murder – kill zone

Medina and Arellanes contend there is insufficient evidence that they intended to kill Rodriguez and so insufficient evidence to support their conviction for her attempted murder. They contend the evidence shows only that they intended to kill Velasquez. They further contend that since there was no evidence to support the kill zone theory of liability, the trial court erred in instructing the jury on that theory, and their attempted murder conviction cannot be upheld under that theory.

### a. Applicable law

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

24

A trial court has a "'duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also had the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation]." [Citation.]' (*People v. Sadler* (1979) 24 Cal.3d 671, 682.)" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921.)

b. Intent required for attempted murder

In order for a defendant to be convicted of attempted murder, there must be evidence the defendant had the specific intent to kill the victim. (*People v. Stone* (2009) 46 Cal.4th 131, 136.) If there are multiple victims, the prosecution must prove the defendant intended to kill each victim. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) The doctrine of transferred intent does not apply to the offense of attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 317.) However, "a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as a means of accomplishing the killing of that victim." (*People v. Smith, supra,* 37 Cal.4th at pp. 745-746; *People v. Bland, supra*, 28 Cal.4th at pp. 329-330.)

The kill zone theory is "'simply a reasonable inference the jury may draw in a given case.'" (*People v. Smith, supra*, 37 Cal.4th at p. 746.) When "a defendant who intends to kill A, and in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group . . . [t]he defendant has intentionally created a kill zone to ensure the death of his primary victim. . . ." (*People v. Bland, supra*, 28 Cal.4th at p. 330.) A jury may "reasonably infer from the method employed an intent to kill others concurrent with an intent to kill the primary victim." (*Ibid.*) When, for example, a defendant uses "a hail of bullets" aimed at a group containing the target

rather than "a single bullet aimed at" the target's head, the jury can infer that the defendant "intended to kill everyone in A's immediate vicinity to ensure A's death." (*Id.* at p. 330.)

Here, the shooter fired at least nine shots at Velasquez and Rodriguez, who were sitting directly next to each other on a wall in front of Rodriguez's house. A tree and three cars near their location were hit by gunfire. Thus, the evidence shows a "hail of bullets" aimed at both Velasquez and Rodriguez, not a "single bullet" aimed at Velasquez alone. The jury could reasonably have inferred that appellants intended to kill Rodriguez concurrently with Velasquez. Thus, there is sufficient evidence to support appellants' convictions for the attempted murder of Rodriguez.

Appellants contend the evidence shows the shooter "took aim" at Velasquez and continued shooting at him alone as he ran up the street and thus did not create a kill zone.[6] There is no direct evidence that Velasquez ran up and down the street. Rodriguez saw Velasquez get off the wall when the shooting started, but did not see where he went. The shooting lasted only a few seconds and when it stopped, Rodriguez saw Velasquez in her front yard, lying on the ground. Thus, it does not seem reasonable to infer that he ran up and down the street while the shots were being fired. However, even if the jury could have reasonably inferred that Velasquez ran up and down the street and the line of cartridges showed that the car was following him and so shooting only at him, that would not require not require reversal of the judgment. (*People v. Nelson, supra,* 51 Cal.4th at p. 210 ["if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

---

[6]     Appellants also contend that since Rodriguez dropped behind the wall once the shooting started, she was not in any kill zone. We see no significance to the fact that Rodriguez took shelter behind the wall after the shooting started. The precise timing of Rodriguez's movement from the top of the wall to the rear of the wall is not certain, although given the rapid succession of the shots fired, it is doubtful she actually made it behind the wall before the shooting ended. Even assuming that she did, she was still in the area where the shots were being fired, and thus still in the kill zone.

We note that appellants' attack on the sufficiency of the evidence relies in part on statements by the prosecutor, in which appellants contend the prosecutor effectively conceded there was insufficient evidence to support the kill zone theory. They point to statements such as "the target in this case is Robert," "the evidence doesn't show they are trying to kill Ruth" "the shooter is unloading, and if Ruth gets in the way, that's just collateral damage," "this isn't shooting in the air . . . [t]his is, I've acquired a target [Velasquez], the target is running and so I'm going to keep shooting at the target because I want to put the target down," and "[t]hey are trying to kill the enemy, and if somebody else gets in the way, oh well." Appellants also contend these remarks are misstatements of the law.

We discuss the challenged remarks in more detail in subsection d below, in which we consider appellants' claim of prosecutorial misconduct. As relevant to appellants' sufficiency of the evidence argument, we do not view the prosecutor's remarks as concessions. Appellants have taken most of the remarks out of context. The prosecutor's statement that the evidence did not show appellants were trying to kill Ruth, for example, was part of the prosecutor's argument that Velasquez was the primary target, and was selected because he looked like a gang member. Ruth, in contrast, was not the primary target. More importantly, the prosecutor was at most arguing his view of the evidence and inferences to be drawn therefrom, and the jury was not bound by that argument. Neither are we.

c. Court's instruction

Since there was sufficient evidence to show that appellants intended to kill Rodriguez in order to kill Velasquez, the court did not err in instructing the jury on the kill zone theory of liability for attempted murder. The court used CALCRIM No. 600 to instruct the jury on this theory, and appellants do not claim there is any flaw in that instruction.

27

d.  Prosecutorial misconduct

Appellants contend the prosecutor committed misconduct by misstating the law concerning the kill zone theory of liability.  Respondent contends that appellants have forfeited this claim by failing to object to the prosecutor's statements and request an admonition.  We agree that the claim has been forfeited.

Appellants contend that if their claims are forfeited, they received ineffective assistance of counsel.  An appellant has the burden of proving ineffective assistance of counsel.  (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  In order to establish such a claim, an appellant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

A prosecutor is given wide latitude during closing argument.  (*People v. Harrison* (2005) 35 Cal.4th 208, 244.)  However, it is misconduct for a prosecutor to misstate the applicable law.  (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)

When a statement by the prosecutor is challenged as misconduct, the reviewing court examines the prosecutor's statement in the context of the whole argument and all the instructions in order to determine whether there is a reasonable likelihood the jury construed or applied the statement in an objectionable way.  (*People v. Hill* (1998) 17 Cal.4th 800, 832.)

The prosecutor argued the kill zone theory as follows:

Now, you also have the crime of attempted murder, which is sort of an interesting law here.  I would submit to you that how this unfolded is like this: the target in this case is Robert [Velasquez].  Robert is a 17-year-old Hispanic male wearing baggy clothes and a L.A. Dodgers hat.  He's standing in front of a house on a high gang street.  This is heart of Pico Viejo.  And he's dressed in the -- I don't know if you call it right or wrong,

28

but he is dressed in the appropriate manner to be a target.

They have acquired their target now. It's not a bunch people like Elizalde and her family who are celebrating the day of the dead. This is now a bona fide target. A young Hispanic male dressed in baggy clothes with a baseball hat in enemy territory.

I submit to you that what happened here is, as they see the target, what they think is I'm going to kill Robert [Velasquez], I'm going to shoot at that guy. And if that girl gets in the way, we'll just take her out, too. I'm just going to kill everybody over there to get to him, to get to Robert. This is called the kill zone theory. If you look down here, the last paragraph, it explains what kill zone is.

Basically what all that says is if you want to kill person X and to get to person X, you don't mind killing person Y, too, then you are guilty of the attempted murder of person Y as well. Even if that wasn't your intended target, even if who you want to get is Robert, you are guilty of the attempted murder of Ruth [Rodriguez], too, because you did everything you could to just blanket that area with gunfire.

If you look at the different pictures that we have, you can see this is -- this is not, like, just a couple of shots. This is People's 10. Okay. Ruth and Robert are sitting by that tree on the left of the picture. You all saw [*sic*] see that? That's where they are sitting when this begins. The car pulls up and stops

29

right in front of them and then the shooting begins.

If you look at this, this is going to be People's 14, which is the sketch. You see 4123 at the top of the screen, here. So that's where they are sitting in front of this tree.

These three cars are all struck with gunfire. This tree is struck with gunfire. The light down by Denise's house is shot out. You see the total of the nine casings which are these little yellow dots going all the way up the street until you get to the point right here at the blue truck.

They are doing everything they can to get Robert. Because if you remember, Robert is running. Robert doesn't drop behind the wall. Robert takes off running. So the shooter is unloading, and if Ruth gets in the way, then that's just collateral damage and that's okay. But because the shooter is creating a kill zone or a zone of danger where those bullets are going, then that means that the shooter and the people who are aiding and abetting him in killing Robert are also guilty of trying to kill Ruth. Do you all understand that? That's called the kill zone theory.

I, don't think that the -- or I submit to you that the evidence doesn't show that they are trying to kill Ruth. What gain is there in killing a girl. They are trying to kill the enemy, and if somebody else gets in the way, oh, well.

30

The prosecutor did use somewhat imprecise language in discussing the kill zone theory, but overall, in context, conveyed the essence of that theory. Taken as a whole, the prosecutor's argument told the jury that even though appellants' intended target was Velasquez, the jury could find that appellants thought, "I'm just going to kill everybody over there to get to him, to get to Robert." That is a correct statement of the kill zone theory.

The prosecutor's remarks about the girl getting in the way, collateral damage and not minding killing another person are most reasonably understood as emphasizing that Velasquez was the primary target. As the prosecutor also pointed out, Velasquez appeared to be a gang member and was in territory claimed by a gang which was a rival of appellants' gang. Thus, appellants had a motive to kill Velasquez. The prosecutor's references to Rodriguez mainly indicated that there was nothing about Rodriguez as an individual which provided a motive for appellants to try to kill Rodriguez. Appellants, the prosecutor, argued, wanted to kill Rodriguez solely as a means of ensuring they killed Velasquez. These remarks are simply an application of the kill zone theory to the facts of the case.

As a whole, the prosecutor's argument properly explained the kill zone theory to the jury, and the application of that theory to the facts of this case. There was no misconduct.

Since there was no misconduct by the prosecutor, trial counsels' failure to object did not fall below an objective standard of reasonableness. "[A] defense counsel is not required to advance unmeritorious arguments on [a] defendant's behalf." (*People v. McPeters* (1993) 2 Cal.4th 1148, 1173.) Appellants' ineffective assistance claim fails.

Even if the prosecutor's somewhat imprecise language had the potential to confuse the jury, there was no prejudice to appellants. The prosecutor clearly told the jury that his remarks referred to the kill zone theory. The prosecutor directly referred the jury to the court's instructions on the theory, saying, "If you look down here, the last paragraph, it explains what the kill zone is." The court's instruction on this topic was clear and correct. Absent any contrary indications, we presume the jury followed the court's

instructions. (*People v. Mayfield* (1993) 5 Cal.4th 142, 179 ["We presume that jurors treat the court's instructions as a statement of the law by a judge and the prosecutor's comments as words spoken by an advocate in an attempt to persuade"].) That presumption is particularly strong in this case, given that the prosecutor referred the jury to the court's instruction as part of the prosecutor's explanation of the kill zone theory. There is no reasonable possibility or probability that appellants would have received a more favorable verdict absent the prosecutor's remarks. (*Chapman v. California* (1967) 386 U.S. 81, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Their ineffective assistance of counsel claim fails for this reason as well.

### 4. Aiding and Abetting Instruction

Medina contends the trial court erred in failing to instruct the jury that an aider and abettor could be found guilty of a lesser included offense even if the jury found the perpetrator guilty of the greater offense. He further contends the court erred in failing to instruct the jury that in order to find a defendant guilty of willful, deliberate and premeditated attempted murder as an aider and abettor, the defendant must have personally premeditated and deliberated the murder. We do not agree. Viewing the instructions as a whole, there is no reasonable likelihood the jury would have understood the instruction as Medina contends.

### a. Murder

Medina contends that the aiding and abetting instruction under CALCRIM No. 400 failed to adequately inform the jury that he could be found guilty of a lesser crime than the actual killer. He asserts the trial court should have instructed the jury that "an aider and abettor's culpability is not necessarily coextensive with that of the perpetrator, and that a person who aided and abetted a crime could also be found culpable for a lesser crime than the perpetrator." Absent such an instruction, he believes the jury had no choice but to convict him of the same crime as the actual perpetrator.

32

The trial court instructed the jury on the general principles of aiding and abetting pursuant to CALCRIM No. 400 as follows:

A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.

A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

The court also instructed the jury pursuant to CALCRIM No. 401 as follows:

To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

1. The perpetrator committed the crime;

2. The defendant knew that the perpetrator intended to commit the crime;

3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

AND

4. The defendant's words or conduct did in fact aid and

33

abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed.

In assessing whether jury instructions correctly convey the law, the reviewing court must look to the instructions as a whole to see whether there is a "reasonable likelihood" the jury understood the instructions as the defendant contends. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385]; *Boyde v. California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316]; *People v. Raley* (1992) 2 Cal.4th 870, 899; *People v. Kelly* (1992) 1 Cal.4th 495, 525-526.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *Boyde v.*

34

*California, supra*, 494 U.S. at p. 378.)  In evaluating jury instructions, courts should "not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would -- with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'  [Citation.]" (*Johnson v. Texas* (1993) 509 U.S. 350, 368 [125 L.Ed.2d 290], quoting *Boyde v. California, supra*, 494 U.S. at p. 381.)

One who aids and abets an offense is guilty as a principal.  (§ 31.)  To be guilty as an aider and abettor, a person must "act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.  [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.)  "The liability of an aider and abettor extends also to the natural and probable consequence of the acts he knowingly and intentionally aids and encourages.  [Citation.]" (*Id*. at p. 560.)

An aider and abettor may be found guilty of a greater homicide-related offense than the actual perpetrator:  "[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea.  If [the aider and abettor's] mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.)  Likewise, an aider and abettor can be convicted of a lesser homicide-related offense than the actual perpetrator.  (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165.)

Generally, "the extent of an aider and abettor's liability is dependent upon his particular mental state, which may, under the specific facts of any given case, be the same as, or greater or lesser than, that of the direct perpetrator." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 624.)

Courts found a previous version of CALCRIM No. 400 concerning aiding and abetting to be potentially misleading.  That instruction read in pertinent part, "A person is equally guilty of the crime whether he or she committed it personally or aided and

35

abetted the perpetrator who committed it." The *Samaniego* court found the use of the phrase "equally guilty" to be misleading under the circumstances (but ultimately harmless). (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1164; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 518-519 [reaching same conclusion for similar CALJIC No. 3.00, but finding error prejudicial].)

CALCRIM No. 400 was revised in 2010 to eliminate the word "equally." (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1119, fn. 5.) The jury in this case was instructed with the revised version of the instruction. This version correctly states the general legal requirements for aiding and abetting liability, including that a "person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (See § 31.) It is an introductory instruction which sets out the basic principle that both direct perpetrators and those who merely aid and abet the commission of a crime are deemed to share criminal liability. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122 [holding that "an aider and abettor 'shares the guilt of the actual perpetrator.' [Citation.]"].) Nothing in CALCRIM No. 400 states that the requirements for being a perpetrator and for being an aider and abettor are identical, nor would a reasonable juror have interpreted that language in such a manner.

The requirements for aiding and abetting are set forth in CALCRIM No. 401. That instruction states that the jury may find aider and abettor liability only when the aider and abettor "knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." In light of CALCRIM No. 401, the jury could not have reasonably disregarded Medina's mens rea in convicting him. Thus, the jury could only have convicted Medina of first degree murder under an aiding and abetting theory if it found that he specifically intended to aid Barrios in the murder and knew of Barrios's unlawful purpose. If the jury found Medina did not intend to aid Barrios's crime, or aided some lesser crime than Barrios committed, then it would have had to acquit him under an aiding and abetting theory.

36

b.  Attempted murder

Medina contends the aiding and abetting instructions were erroneous because they did not require a finding that Medina personally acted with deliberation and premeditation in the attempted murder, and did not require a finding that a premeditated and deliberated attempted murder, as opposed to simply an attempted murder, was the natural and probable consequence of the target offense of murder.  We do not agree.

The prosecution was not required to prove Medina's personal premeditation and deliberation.  The crime of attempted murder requires "*only* that the murder attempted must have been willful, deliberate, and premeditated, *not* that the attempted murderer personally must have acted willfully and with deliberation and premeditation." (*People v. Lee* (2003) 31 Cal.4th 613, 622, italics in original (*Lee*).)  Thus, one who aids and abets another in committing attempted murder can be subject to the greater punishment for willful, deliberate, and premeditated attempted murder even though he or she did not personally act with the requisite willfulness, deliberation, and premeditation.  (*Id*. at pp. 616, 627.)  This is true even when liability for the attempted murder is based on the natural and probable consequences doctrine.  (See *People v. Favor* (2012) 54 Cal.4th 868, 879-880 (*Favor*); *People v. Cummins* (2005) 127 Cal.App.4th 667, 680; *People v. Curry* (2007) 158 Cal.App.4th 766, 791-792.)

Under the natural and probable consequences doctrine as applied to attempted willful, deliberate, premeditated murder, the jury must find the attempted murder was a natural and probable consequence of the target crime, here murder.  (*People v. Favor, supra*, 54 Cal.4th at p. 872. )  The jury need not find that premeditation was a natural and probable consequence of the target offense.  (*Ibid*.)  In other words, "[u]nder the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense.  It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation."  (*Id*. at p. 880.)

37

Medina contends that the holdings of *People v. Lee, supra,* 31 Cal.4th 613 and *People v. Favor, supra,* 54 Cal.4th 868 are based on the premise that a finding of personal willfulness, premeditation and deliberation is not required for aiding and abetting liability because section 664, subdivision (a) is a penalty provision and so not subject to the requirements of a jury finding and proof beyond a reasonable doubt. He argues that the cases are incorrect as a matter of federal constitutional law in light of the United States Supreme Court's subsequent decision in *Alleyne v. United States* (2013) ___ U.S. __ [133 S.Ct. 2151, 186 L.Ed.2d 314] (*Alleyne*).) We do not agree.

The court in *Alleyne v. U.S., supra,* ___ U.S. ___ [133 S.Ct. 2151] held that any fact that increases the mandatory *minimum* sentence for a crime is an element of the offense that must be found true by a jury beyond a reasonable doubt. (*Id*. at p. __ [133 S.Ct. at p. 2158 ].) This holding is based on the court's earlier decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466, in which the court held that any fact which increases the *maximum* penalty for a crime is an element of the offense that must be found true by a jury beyond a reasonable doubt. (*Id*. at p. __ [133 S.Ct. at pp. 2155-2158].) Section 664, subdivision (a), increases the maximum penalty for attempted murder and so has long been subject to the federal constitutional requirement that it must be found true by a jury beyond a reasonable doubt. Although the court in *People v. Lee, supra,* 31 Cal.4th 613 and *People v. Favor, supra,* 54 Cal.4th 868 refers to section 664, subdivision (a), as a penalty provision, nothing in those decisions suggests that the court based its holdings on an incorrect understanding of established federal constitutional law concerning penalty provisions. To the contrary, the court in *Lee* recognized that *if* section 664, subdivision (a), contained a requirement that an aider and abettor personally act with premeditation and deliberation, the jury would have to be instructed to determine whether such an attempted murderer so acted. (*Lee, supra*, 31 Cal.4th at p. 616 [potential second issue for review was "what is the standard of prejudice for a trial court's failure to instruct the jury to determine whether such an attempted murderer so acted?"].) Thus, the court was clearly aware of the requirement of a jury determination before the penalty provision of section 664, subdivision (a) could be imposed.

38

The holdings of *People v. Lee, supra*, 31 Cal.4th 613 and *People v. Favor, supra*, 54 Cal.4th 868, are dispositive of the issue here. Accordingly, Medina's argument must be rejected. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In sum, when the aiding and abetting instruction is considered together with the instructions on murder, attempted murder, and the natural and probable consequences doctrine (CALCRIM Nos. 402, 520, 521, 600, 601), it is clear the jury was adequately instructed as to the requisite intent for both aiders and abettors and direct perpetrators, and thus there was no reasonable likelihood that the jury understood the aiding and abetting instructions as Medina argues.

### 5. Arellanes – Sufficiency of the evidence

Arellanes contends there is no solid evidence to show that he was in the SUV when the shooting occurred or to show that he aided and abetted the shooting and so there is insufficient evidence to support his convictions. He further contends such convictions violate his federal constitutional right to due process.

### a. Presence in the SUV

Tina Perez testified that Arellanes, Barrios and Medina left her house around 10:25 to 10:30 p.m. on the night of the shooting. Tina testified that David did not leave the house when the three men did or at any later time that night. Tina heard sirens and helicopters five to ten minutes later. Elizalde testified that she saw a gold or pewter SUV drive up and down Zola Avenue at about 10:30 p.m. that night. She went inside and five to ten minutes later heard gunshots. These facts support a reasonable inference that Arellanes was in the car with Barrios and Medina when the shooting occurred.

Appellant contends it is more reasonable to infer that David Perez was in the SUV with Barrios and Medina because David was with the two men earlier when they "banged" a man at a 7-11 store. The jury was free to disbelieve Tina's testimony and infer that David returned to the SUV with the Barrios and Medina on the basis of his involvement in the earlier encounter. However, the inference that David was in the

39

SUV is, at most, as reasonable as the inference that Arellanes was in the SUV, not more reasonable. It does not require reversal of the judgment. (*People v. Nelson, supra,* 51 Cal.4th at p. 210 ["if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

### b. Aiding and abetting

As we discuss in more detail in section 4 above, a defendant is liable as aider and abettor if he acts "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose of either committing, or of encouraging or facilitating commission of, the offense." (*People v. McCoy, supra*, 25 Cal.4th at p. 1118.)

Mere presence at the scene of a crime and mere knowledge of criminal conduct are not alone sufficient to show culpability as an aider and abettor. (*People v. Durham* (1969) 70 Cal.2d 171, 181.) However, presence at the scene of the crime is a factor which may be considered in deciding whether a defendant aided and abetted a crime, as may companionship with the actual perpetrator, conduct before and after the crime, and flight from the scene. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

Here, Arellanes was with fellow Brown Assassin gang members Medina and Barrios at the Perez residence. He went with them to Zola Street, which was in the territory of a rival gang. That street is "not off a main boulevard. So you would have to kind of make your way into that neighborhood." According to gang expert Ortega, the "area is deep in a dense populated gang territory of Pico Viejo gang members. And the only reason why Brown Authority persons would be there, in my opinion, would be to be looking for trouble." Arellanes covered his face with a ski mask, as did Medina and Barrios, suggesting that Arellanes was aware that that criminal activity was planned. These facts support an inference that Arellano knew of the others' criminal purpose and intended to encourage or facilitate that purpose theory of aiding and abetting. (See *People v. Jones* (1989) 212 Cal.App.3d 966, 970 [defendants' acts of wearing masks and entering and leaving the crime together supported the theory of aiding and abetting].)

40

This inference is strengthened by Arellanes's attempt to flee from police when they came to arrest him, which can show consciousness of guilt. Thus, there is sufficient evidence to support a finding that Arellanes aided and abetted the murder and attempted murder in this case.

### c. Due process

Since we have determined that "a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation] as is the due process clause of article I, section 15 of the California Constitution." (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

### 6. Text messages

Arellanes contends evidence that Barrios sent a text to Arellanes which read, "Go buy [*sic*] bye. Tell devil." was inadmissible under the *Aranda-Bruton* rule and the trial court erred prejudicially in admitting it.[7] He further contends the admission violated his Sixth Amendment right to confrontation.

The *Aranda-Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. "'*Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." [Citation].'" [Citation.] (*People v. Hajek* (2014) 58 Cal.4th 1144, 1176.)

Since the *Aranda-Bruton* decisions, however, the United States Supreme Court has clarified that the confrontation clause of the Sixth Amendment is concerned solely with out-of-court statements that are "testimonial." (*Crawford v. Washington* (2006) 547 U.S.

---

[7]     This rule derives from *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.

813, 821-825.)  Thus, the confrontation clause does not apply to nontestimonial out-of-court statements (*Whorton v. Bockting* (2007) 549 U.S. 406, 420), including such statements by codefendants.  (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)  Given this clarification in the law, it is questionable whether the *Aranda/Bruton* rule applies to nontestimonial out-of-court statements by a codefendant, since "[i]f none of the codefendants has a constitutional right to confront the declarant, none can complain that his right has been denied."  (*United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85.)  The text message to Arellano was not "testimonial."

Even if the *Aranda-Bruton* rule still applied to non-testimonial statements, it would have no application in this case.  The rule applies only to statements which are facially incriminating.  (*Richardson v. Marsh* (1987) 481 U.S. 200, 207-208.)  As the court in *Richardson* explained, the *Aranda-Bruton* rule is a "narrow exception [that] should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial.  [Citation.]"  (*People v. Hajek, supra,* 58 Cal.4th at pp. 1176-1177.)

The text message in this case is not facially incriminating.  It contains no references to any crime.  The message is not even clear about who is going "buy [*sic*] bye."  It could be a suggestion to the recipient that he should go "buy [*sic*] bye" or a statement by the sender that he is going "buy [*sic*] bye" or possibly a directive to the recipient to tell "devil" to go "buy [*sic*] bye."  The reason for leaving is not given.  (See *People v. Homick* (2012) 55 Cal.4th 816, 874-875 [codefendant Woodman's post-arrest call to coworker asking him to destroy business cards was not facially incriminating as to defendant Homick; it became incriminating only when considered with other evidence showing two of the business cards were Homick's].)

Appellant contends that the text message is incriminating through inference, and that the *Aranda-Burton* rule applies to inferentially incriminating statements.  We do not agree.  The class of inferentially incriminating statements to which the *Aranda-Bruton* rule applies are "obvious" ones, "inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."  (*Gray v.*

42

*Maryland* (1998) 523 U.S. 185, 196.)  The content of the text message does not pass this test.  Leaving or telling someone else to leave is not incriminatory by itself.

Further, even when considered with other evidence, the message has little, if any, additional incriminating effect.  The evidence showed that Barrios, Medina and Arellanes were not communicating with each other on their cell phones between 7:19 p.m. and about 4:00 a.m. when Barrios was arrested.  Then, about 4:30 a.m., while Barrios was apparently alone in the back of a police car, he contacted Medina and Arellanes.  Arellanes's cell phone record shows that he began moving around 5:00 a.m., toward Ontario.  Thus, Arellanes was already on the move when he received the "buy [*sic*] bye" text message at 7:13 a.m., indicating that the message may not have been intended to be a catalyst for Arellanes's flight.

Further, given that Barrios's time alone in the patrol car ended around 7:00 a.m., the most reasonable understanding of the message may be that Barrios himself was going "buy [*sic*] bye" after several hours of sitting around in the patrol car, or was ending communications because law enforcement officials had come to the patrol car and he could no longer communicate freely.

Since the text message was not facially incriminating, its admission was not barred by the *Aranda-Bruton* rule.  Arellanes's Sixth Amendment right to confrontation was not violated.

### 7.  Constitutionally fair trial

Arellanes contends cumulative error requires reversal of their convictions.  We have found few, if any, errors.  Considered together, any minor errors were harmless and did not result in an unfair trial.  (See *People v. Marshall* (1996) 13 Cal.4th 799, 861, fn. 14.)

### 8.  Restitution fines

Barrios claims the trial court erroneously relied on the amended versions of sections 1202.4 and 1202.45 to impose a $280 restitution fine and a corresponding $280

parole revocation fine. He contends these fines violated the prohibition against ex post facto laws because the amended versions went into effect on January 1, 2013, after the commission of the crimes in this matter.

"[T]he imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions." (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Thus, a defendant may challenge the imposition of a restitution fine under section 1202.4 as violating the ex post facto clauses of the California and federal Constitutions, if the fine is greater that authorized by section 1202.4 at the time he committed his crimes. (*Ibid*.)

The amended version of section 1202.4 sets the minimum restitution fine at $280. (§ 1202.4, subd. (b)(1).) The version of section 1202.4 in effect at the time of appellants' crimes set the minimum fine at $200. Both versions set the maximum fine at $10,000. (See *People v. Souza, supra*, 54 Cal.4th at p. 143 [explaining former section 1202.4].) The same is true for the corresponding parole revocation fine. (§ 1202.45.)

Respondent is correct that the $280 fine imposed by the trial is within the range authorized by the version of section 1202.4 in effect at the time of the crimes in this case. However, the minimum fine was $200, and in setting the amount of the fine in excess of the minimum, the trial court is directed to consider any relevant factors, which include but are not limited to the defendant's inability to pay and the circumstances of the offense. Thus, a trial court must have some reason for departing from the statutory minimum.

"Express findings by the court as to the factors bearing on the amount of the fine shall not be required." (§ 1202.4, subd. (d).) Here, the trial court gave no explanation for the amount of the fine.

Barrios contends that the fact that the trial court imposed the fines in the minimum amount required by the amended versions of the sections ($280) shows that the court intended to impose the minimum fine but erroneously relied on the amended versions to do so. Such an inference is a reasonable one. It also reasonable to infer that the trial court was aware that the applicable minimum fine was $200 but properly considered the

44

fact that the Legislature had increased the minimum fine to $280, and decided that the higher amount was appropriate. (See *Peugh v. United States* (2013) __ U.S. __ [186 L.Ed.2d 84] ["notwithstanding a rule that retrospective application of a higher Guidelines range violates the *Ex Post Facto* Clause, sentencing courts will be free to give careful consideration to the current version of the Guidelines as representing the most recent views of the agency charged by Congress with developing sentencing policy . . . . The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes"].)

We presume that the trial court "knows and applies the correct statutory and case law [citation] and is able to . . . recognize those facts which properly may be considered in the judicial decision making process. [Citations.]" (*People* v. *Coddington* (2000) 23 Cal.4th 529, 644.) Barrios has not overcome that presumption. His claim fails.


9. Presentence custody

Medina and Arellanes contend they are entitled to a total of 934 days of presentence custody credit. Respondent agrees. We agree as well.

Both appellants were arrested on November 3, 2010 and sentenced on May 24, 2013. The total number of actual days in custody, including the day of arrest and the day of sentencing, is 934. (See *People v. Bravo* (1990) 219 Cal.App.3d 729, 735.)


10. Restitution liability

Medina contends the abstract of judgment must be corrected to show that he is jointly and severally liable with Barrios and Arellanes for victim restitution. Respondent agrees, and points out that this notation is missing from all three appellants' abstracts and so all should be corrected. We agree.

The court stated that "each defendant is ordered to pay restitution" and it would be "joint and several." This is not reflected in the abstracts of judgment. The abstracts are ordered corrected. (See *People v. Arnold* (1994) 27 Cal.App.4th 1096, 1098-1100 [joint

45

and several restitution proper; defendant is responsible for full amount of victim's losses but payments by other responsible parties are deducted from the amount owed].)

Disposition

The presentence custody credits awarded to appellants Medina and Arellanes are ordered corrected to 934 days. The abstract of judgment is ordered corrected to reflect this amount. The abstract of judgment for Medina, Arellanes and Barrios is ordered corrected to reflect the trial court's ruling that each is jointly and severally liable for the direct victim restitution award. The clerk of the superior court is instructed to prepare amended abstracts of judgment reflecting these changes and to deliver copies to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:



MOSK, ACTING P.J.



KRIEGLER, J.

_____

[*] Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.